**James Taylor BROWN, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 1331–85.**

Court of Criminal Appeals of Texas, En Banc.

July 13, 1988.

Kerry P. Fitzgerald, Dallas, for appellant.

Henry Wade, Dist. Atty., and John D. Nation, Knox Fitzpatrick and Earl Cross, Asst. Dist. Attys., Dallas, Robert Huttash, State's Atty., Austin, for the State.

## OPINION DISSENTING TO REFUSAL OF APPELLANT'S PETITION FOR DISCRETIONARY REVIEW

CLINTON, Judge, dissenting.

This is an appeal from a conviction for murder proscribed by V.T.C.A. Penal Code, § 19.02(a)(1). The cause is here for a second time on a *Cobarrubio* issue. See *Cobarrubio v. State*, 675 S.W.2d 749 (Tex.Cr. App.1983).

The evidence adduced by the State showed a casual encounter leading to a confrontation followed by a struggle that resulted in a killing.[1]

The next day, accompanied only by his mother, appellant surrendered himself to a Dallas detective who was investigating the case. Appellant made a oral statement about the event, but the detective did not take a written statement from him.

His twenty year old brother testified that he and appellant went to the park in an automobile driven by Carl Wynn, a friend; they parked near the pickup, got out and walked around to the band area. At some point in time appellant went back to the car alone.

Appellant testified that he was twentytwo years old, that he did go to the park, walked around awhile with his brother but then went back to the car. Nearby was another vehicle with two girls in it; he walked over to talk with them. From that point on he related developments that ultimately led the judge of the trial court to instruct the jury on the law of voluntary manslaughter and selfdefense, as well as murder.[2]

1. At a Sunday evening hour in April in a city park, appellant approached a Ranchero pickup occupied by two sixteen year old women, Tammy Ferrell and Portland Allen; apparently unknown to him, their two male companions, Eddie Thomas, Jr., age 44, and Eugene Mathis, 18, had gone for a walk. (Charles Hutchinson, Jr. saw them somewhere in the park and was invited to come to the pickup later on.) Appellant was talking with Ferrell when the males returned, and Allen told Thomas that appellant was bothering her. Thomas asked appellant to leave her alone, and appellant went back to the car.

Shortly Thomas and Mathis approached appellant at the car. Thomas and he were engaged in "friendly" conversation about cars when appellant changed the subject to drugs by asking if Thomas wanted to buy some "black mollies," and when Thomas declined appellant said he had "Preludes" for sale. Thomas told appellant "I can get you in trouble [with the police] for this." Appellant said something like "he didn't care," and then told Thomas to "move away from my car" and "get out of my face." Thomas and Mathis moved about two feet away to the front of the pickup, and Thomas asked appellant, "Well, is this far enough?" At first appellant made no response, but after Thomas sat on the right front of his pickup, appellant said, "That ain't far enough," pulled a handgun from his waistband, walked over and "put it in Eddie's face." Thomas knocked the gun down, and it discharged a bullet into right front fender of the pickup. Thomas jumped off and charged appellant, causing both to fall to the ground, where they struggled. There was another shot, and Mathis saw Thomas "rolling off" appellant. Appellant got up and fired two more shots at Thomas; he then fled, firing one more along the way.

2. Thomas died from a bullet entering his head just in front of his left ear and causing massive damage to the neck below. His blood alcohol content was .143, and a mouth swab tested positive for tetrahydrocannabinol.

Appellant was not acquainted with any of the four persons who came to the park in the pickup. When he reached the passenger side of the pickup, appellant saw the girls were smoking a marihuana cigarette. He asked for some, and the girl on the driver side said, "No." He offered to buy a cigarette, but they said no to that. Appellant then went back to the car he had come in. Sitting somewhere on the outside of the car, he watched as a male he named Ronald Gene walked to the driver side of the pickup, and one of the girls give him a cigarette. Two men (Thomas and Mathis) came up and Gene passed the "joint" he was smoking to "the older guy" (Thomas), and together they smoked it. Then Gene left.

In a short while Thomas and Mathis approached appellant and asked if he wanted "to buy a joint;" appellant said he had asked the girls to sell him one, and Thomas retorted, "We don't sell joints," and added that he had "something better than a joint" anyway. Thomas went back to his pickup, opened a door and went "behind the seat for some reason."

While Thomas was at his pickup, Mathis and appellant got to arguing about whether appellant wanted to buy any drugs except the "joint." Thomas returned to the car on which appellant sat and said, "[W]hy don't [you] leave, get out from around that area," and appellant responded, "This is a free park." There was more "arguing," until "smell[ing] like he had been drinking a lot," the "older man was in my face talking about.... I don't want to buy this and

During the process of preparing the court's charge to the jury, appellant submitted written requested instructions on murder in harmony with *Cobarrubio*, coupled with voluntary manslaughter, and on selfdefense. Although the judge noted on the first request that he "included it in Court's Charge to Jury," the proposed paragraph authorizing the jury to convict for murder omitted:

"and you further find beyond a reasonable doubt that, at the time the death was caused, the defendant was not acting under the immediate influence of sudden passion arising from an adequate cause."

As the court proposed to give it, the charge did include definitions and an instruction on voluntary manslaughter and another part on selfdefense, much as appellant had requested.

After the initial charge had been amended as indicated above, the judge announced that the court "has received the requested special charges of the Defendant and has included them in its charge to the Jury." Then he inquired:

I'm just messing with them girls" and "all I want to do is start some ... stuff."

"Absolutely afraid," appellant turned to leave. He was hit from behind by "the older man," and both men "rushed" and "attacked" and "knocked" [him] to the ground; after he went down, as "the youngest man" was standing over him, appellant "felt something right here, felt like a shoe or whatever or he hit me with something."

Appellant then recounted what happened next, *viz:*

"When I was on the ground I pulled the gun and shot the man. I shot one time and, you know, the gun just went off one time cause I pulled the trigger and the second time I shot within [sic], you know, and I shot again and seem like the man just fell over and I got up and ran.... I left the gun right there when I got up."

On cross examination appellant explained the first shot must have not hit deceased "because he was still hitting me;" appellant was on his back, shooting up. He did not aim the second shot, not intending to shoot somebody, but was "trying to get him off of me." (Appellant "guessed" where the gun was relative to positions of their bodies and arms, but the best the record reflects is usage of such terms as "like this.") When he dropped the gun and left it there, "I wasn't thinking. All I knew is I had shot him."

"I'll ask the Defense if your requested charges have been included in a satisfactory way in the Court's charge to the Jury?"

Alas, counsel for appellant answered, "They have, Your Honor." Pressing his inquiry further, the judge stated that he had submitted the court's charge to counsel for both parties, and wondered if "the Defendant has any objections or exceptions" to the charge, receiving a negative reply. Wrapping it up, the judge then asked, "You find the charge entirely satisfactory?" Counsel answered, "It is." The State expressly stated, "No objections or exceptions to the Court's charge." [3]

After arguing the facts of the matter from the State's point of view, first prosecutor added, "Before I sit down, let me point out one thing to you about the charge [on selfdefense]." He then argued essentially the jury had to believe appellant and that his testimony in that regard was not credible, making among others the following remarks:

"... He never said he feared for his life. He came up with some story that he was

3. When first submitted on appeal the Dallas Court of Appeals declined to apply *Cobarrubio* on the ground that appellant in this cause made no objection. *Brown v. State* (Tex.App. No. 05–83–00034–CR, delivered March 16, 1983); this Court vacated that judgment and remanded for further review consistent with our opinion in *Almanza v. State*, 686 S.W.2d 157 (Tex.Cr. App.1985) (Opinion on Rehearing at 171 ff). On remand the Dallas Court of Appeals agreed with appellant that "the trial court erred in failing to charge on the negation of sudden passion within the charge on murder." Noticing how the charge had been developed and the colloquy between court and counsel, the Dallas Court found that appellant did not "properly preserve an objection to the charge," and proceeded to make an *Almanza* analysis for "egregious harm." The Dallas Court seems basically to have believed that the evidence "raised, at most, the issue of self-defense," not voluntary manslaughter in that, under *Daniels v. State*, 645 S.W.2d 459 (Tex.Cr.App.1983), testimony by appellant that he was "absolutely afraid" will not demonstrate sudden passion arising from an adequate cause. Moreover, the Dallas Court noted that argument by counsel for appellant "touched only tangentially on the subject [of voluntary manslaughter]." Accordingly, it again affirmed the conviction. *Brown v. State* (Tex.App. No. 05–83–00034–CR, delivered October 22, 1985).

attacked and could not even go into the details of what happened, and admitted that he shot him. He didn't ever say, *as far as this business in the charge about the lesser included offense of voluntary manslaughter,* he didn't say he was acting out of sudden passion. He just said, well, he was scared.

I submit to you, ladies and gentlemen, *based on the law that you will take back there with you,* based on that law it is a case that cries out for conviction of murder." [4]

One attorney for appellant also discussed his view of relevant testimony. Referring to the confrontation "when Mr. Thomas approached Mr. Brown on that Sunday," counsel recalled:

"... He was scared from the initial moment when they came up to him and approached him. His fear began when Eddie Thomas and Eugene Mathis walked up to him and confronted him as to why he was talking to the two women in the truck."

Later, alluding to exhibits showing blood of deceased on the ground and on side of Wynn's car, the same counsel argued:

"... We know the blood is there ... but that doesn't make the State's case true just because there is blood. The State has got to prove that Mr. Brown took the life intentionally and knowingly without provocation, with out justification, without it being self defense.

Was there sudden passion? Would being scared for your life be sudden passion? * * * [5]

Well, on the 27th day of April, 1980, Eddie Thomas [and others] went to the park that day, and Mr. Thomas lost his life, but he was not acting within the law on that particular day. He put Mr. Brown in fear of his life. Mr. Brown, as he told you, that when he dropped the

pistol and ran, was scared of him as he was when he saw Mr. Thomas come around the side of the truck toward him, not knowing what he had."

Counsel concluded by asking the jury "to take into consideration of all the facts" and, "as you said that you would do [on voir dire]," "follow the law."

Cocounsel for appellant interpreted the evidence more in a context of selfdefense, but in such way as to emphasize aspects of sudden passion, as well, *viz:*

"Then these two other people confront him.... [Y]ou can reasonably deduct from the evidence they were laughing, trying to get him off guard. Try to picture the situation. Eddie Thomas, once he thought the young man's back was turned and he tried to walk off, stopped him, but he didn't know he had a gun.

&ast; &ast; &ast; &ast; &ast; &ast;

... The man jumped on him and they struggled to the ground, and he said, 'I am trying to get my gun.' ... He said, 'It was in my waist band.' He was steadily beating on him, his side kick was trying to kick him in the back. Mr. Brown is still fighting back. 'I am afraid. I just pulled the trigger.' The first bullet went into the car. The next bullet ... [h]e doesn't know where it went. When the man relaxed on him, he got up and ran. He said he dropped the pistol. Now, is that so hard to believe?"

The closing argument by the second prosecutor was winding up when he asserted:

"This is a killing. It's plain and simple. It can't be any other way. There is no self defense, no voluntary manslaughter. It is just out and out murder."

Characterizing appellant as "aggravated," he argued there were other reasons: ag-

---

4. All emphasis throughout this opinion is mine unless otherwise indicated.

5. To which a prosecutor objected, "There is no evidence in this case that he was scared for his life." The court overruled that objection. The prosecutor then asked that defense counsel "make reasonable deductions from the evidence and not his own opinions;" the court admonished him to "make your objections to the Court," and apparently addressing appellant's attorney, cautioned him to "relate your arguments as reasonable deductions from the evidence."

gravated because "he couldn't sell any Black Mollies," aggravated because "the sixteen year old and the other girl wouldn't have anything to do with him." He contended that deceased "came up and somehow got mixed up in it," and "[h]e got killed when he told him to stay away from the girls." Counsel called attention to photographs, talked about needle marks, being drunk and smoking marihuana in a park, and concluded:

"... Should you lose your life because you're not [out?] there smoking marihuana? ... Can you lose your life because you have had too much to drink in a park? I'll ask you to go back there, look at the charge and follow the law and find the Defendant guilty of murder, exactly as charged. All the evidence that you heard points to his guilt. It can't be any other way."

The jury retired to deliberate at 4:26 p.m. August 6. The record contains two written requests by the jury for reading certain testimony by appellant: one, "starting with return of Eddie Thomas and Eugene Mathis to their car until his (James Brown) running from the scene;" the other, "describing the firing of the gun." File marked August 6, without time mark, there is a response to each by the court in like form, to the effect that jurors are entitled only to testimony in dispute.

After 6:00 p.m. the jury was in the box and the judge announced court would recess until 8:30 in the morning, but before doing so, he would like "to answer your note." He then read the first note described above, and the form response. With that he excused the jury. So far as the record reveals, the judge did not read his response to the second note.

The following morning, August 7, at a time not shown by the record, the jury sent out a third note stating it was in disagreement, and requesting a reading of the testimony of appellant "relative to his description of firing the second and third shots." An agreed transcription of notes of the court reporter was prepared, and the court summoned the jury and read the questions and answers. That material has been summarized *ante,* at 756, and the full transcription is appended hereto.

The jury returned its verdict at 12:45 p.m. August 7.

The State has not disputed that evidence raising the issue of whether appellant caused the death under the immediate influence of sudden passion arising from an adequate cause (hereafter "sudden passion") is sufficient enough to warrant the trial court in charging on voluntary manslaughter. It did not object to the charge in that respect; it did not contend for insufficiency in the court of appeals. Its position has always been that the instructions as given are proper and not fundamentally erroneous. Thus, the Dallas Court of Appeals decided a nonissue.

In this cause absence of "sudden passion" is an element of murder under § 19.02(a)(1), supra. *Bradley v. State,* 688 S.W.2d 847, 851 (Tex.Cr.App.1985). Accordingly, appellant was entitled to an acquittal on the charge of murder unless the State proved an absence of "sudden passion" beyond a reasonable doubt. See, e.g., *Lawrence v. State,* 700 S.W.2d 208, 211, 213 (Tex.Cr.App.1985). The trial court was required to so instruct the factfinder in the paragraph authorizing the jury to find appellant guilty of murder. In failing to do so, the trial court erred. Article 36.14, V.A.C.C.P. and *Cobarrubio v. State,* supra.

Since it was decided in 1983, this Court has reviewed several cases with "*Cobarrubio* error." A recent decision is *Ruiz v. State,* 753 S.W.2d 681 (Tex.Cr.App.1988). Therein, after collecting and examining principal cases involving a failure properly to instruct the jury on the State's burden to prove absence of "sudden passion," we found that certain analytical nuances seem to determine whether such error created "egregious harm." *Ruiz v. State,* at 684–86.

In this cause there are similar considerations beyond the somewhat simplistic analysis employed by the Dallas Court of Appeals. This Court should sort them out for the benefit of bench and bar in resolving

recurring variations on the *"Cobarrubio* error" theme.

Because the Court does not grant appellant's petition for discretionary review, I respectfully dissent.

## APPENDIX

DIRECT EXAMINATION BY MR. HOPKINS OF JAMES TAYLOR BROWN:

Q Did you pull a gun?

A When I was on the ground, I pulled the gun and shot the man. I shot one time and, you know, the gun just went off one time cause I pulled the trigger. And the second time I shot, you know, I shot again and it seemed like the man just fell over. And I got up and ran.

UNRELATED TESTIMONY

CROSS EXAMINATION BY MR. FITZPATRICK OF JAMES TAYLOR BROWN:

Q Okay. Now, Mr. Brown, you say after you shot him, you shot again, is that right?

A The first time I shot, it must have didn't hit him because he was still hitting me.

Q Where did you have the gun pointed the first time that you shot at him?

A The gun was just in my hand.

Q Just in your hand?

A I was on the ground and I was shooting up.

Q Shooting up at the sky?

A Yes, I was on my back.

Q Okay. On your back. You shot that first one up at the sky?

A I just shot it. I didn't know which way it went or nothing.

Q All right. Now, so you're on your back and the deceased is on you; is that right?

A Yes.

Q All right. And where did you aim that second shot?

A I didn't aim. I just shot it the second time.

Q You just shot it?

A yes.

Q You were hoping you were going to hit somebody, right?

A Well, I, you know, I just shot the gun.

UNRELATED TESTIMONY

CONTINUED CROSS EXAMINATION BY MR. FITZPATRICK:

Q What was impeding your arm?

A He had my arm, I guess. He had me period because he was on top of me and I guess he saw me pulling the gun. And the way it happened we must have been struggling because he grabbed me and the gun, I guess. Then I tried to shoot it and it shot and I shot it again and again.

UNRELATED TESTIMONY